JEFFREY G. SLOANE, ESQ.
Nevada Bar No. 000784
KRAVITZ, SCHNITZER, SLOANE,
JOHNSON & EBERHARDY, CHTD.          E-filed:  5-22-09
8985 S. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123
(702) 222-4143
JSloane@kssattorneys.com
Attorney for Creditor/Movant
WELLS FARGO BANK, N.A.

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| In Re: | ) | In Proceedings Under |
| | ) | Chapter 13 |
| ELMO J. BENTLEY and | ) | |
| ROBERTA M. BENTLEY | ) | BK-S-08-19071-LBR |
| | ) | |
| Debtors. | ) | Date:  June 17, 2009 |
| | ) | Time:  10:00 a.m. |

### MOTION FOR RELIEF FROM STAY

COMES NOW, WELLS FARGO BANK, N.A.  (hereinafter referred to as "Creditor"),

the holder of a secured claim in the above-captioned matter, by and through its attorney, Jeffrey

G. Sloane, Esq. of the law firm of Kravitz, Schnitzer, Sloane, Johnson & Eberhardy & Chtd.,

and respectfully represents to the Court as follows:

1.    On or about December 8, 2008, ELMO J. BENTLEY and ROBERTA M.

BENTLEY, (hereinafter referred to as "Debtors"), filed a voluntary petition under Chapter 13 of

the Bankruptcy Code.

2.    Since the filing of said petition, Debtors have remained in possession and

control of the Estate of the Debtors.

3.    Debtors are in possession of a certain real property located in Las Vegas,

Nevada, more particularly described as follows:

THAT PORTION OF THE NORTHWEST QUARTER (NW 1/4) OF THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 5, TOWNSHIP 22 SOUTH, RANGE 61 EAST, M.D.M. LOT TWO (2) AS SHOWN BY MAP THEREOF IN FILE 2 OF PARCEL MAPS, PAGE 13, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, PARCEL NUMBER 177-05-301-010.

More commonly known as 6970 S. Valley View Blvd., Las Vegas, Nevada 89118-5262.

    4.    On or about May 09, 2005, the Debtors executed an Adjustable Rate Note and Deed of Trust in favor of the Creditor, for the purpose of securing a loan in the amount of $100,000.00 plus initial interest at the rate of 7.34% per annum thereon.  See copies of Note and Deed of Trust attached hereto and incorporated herein as Exhibits "1" and "2", respectively. Payments are currently $63.88.

    5.    That the balance currently due and owing to the Creditor is $18,062.85, exclusive of fees and costs.

    6.    That the Debtors are post-petition past due for the months of December 20, 2008 through and including April 20, 2009, in the amount of $310.91, exclusive of fees and costs.

    7.    That the fair market value of said property is approximately $425,000.00 pursuant to Debtors's Schedules.

    8.    The Creditor does not have and has not been offered adequate protection for its interest in said real property.

    9.    Based on the aforementioned Note and Deed of Trust to said real property held by the Creditor, the Creditor has a security interest that will be jeopardized if the stay is not lifted.

    10.    If the Creditor is not permitted to pursue its remedies against the Debtors, it will suffer irreparable injury, loss and damage.

1    WHEREFORE, WELLS FARGO BANK, N.A., prays that upon the hearing of

2  this Motion, the stay afforded the Debtors pursuant to 11 U.S. Code Section 362 be terminated

3  so as to permit WELLS FARGO BANK, N.A. to pursue foreclosure proceedings and to

4  continue and/or complete the same and apply the proceeds of said sale to the indebtedness due

5  the Creditor by the Debtors provided the debt to the Creditor is not cured in the time required

6  by law.

7    Upon disposition of the collateral, WELLS FARGO BANK, N.A. will amend or delete

8  its Proof of Claim on file with the Court and provide the Chapter 13 Trustee notice of the same.

9    DATED this 22nd day of May, 2009.

10

11                          KRAVITZ, SCHNITZER, SLOANE,
                            JOHNSON & EBERHARDY, CHTD..

12

13

14

15                          BY  /s/JEFFREY G. SLOANE, ESQ.
                            JEFFREY G. SLOANE, ESQ.
16                          Nevada Bar No. 000784
                            8985 S. Eastern Avenue, Suite 200
17                          Las Vegas, Nevada 89123
                            Attorney for Creditor

18

19

20

21

22

23

24

25

26

27

28

## * *§ 362 INFORMATION SHEET * *

ELMO J. BENTLEY and
ROBERTA M. BENTLEY                    BK-S-08-19071-LBR
DEBTORS                               Case No:                    MOTION #: _____

WELLS FARGO BANK, N.A.       CHAPTER: ___13___

---

### Certification of Attempt to Resolve the Matter Without Court Action:

*Moving counsel hereby certifies that pursuant to the requirements of LR 4001(a)(3), an attempt has been made to resolve the matter without court action, but movant has been unable to do so.*

Date: _____May 22, 2009_____        Signature: __/s/JEFFREY G. SLOANE, ESQ.__
                                                    *Attorney for Movant*

---

PROPERTY INVOLVED IN THIS MOTION:___6970 S. Valley View Blvd., Las Vegas, NV 89118-5262___

NOTICE SERVED ON: Debtor(s)___X___; Debtor's Counsel ____X____; Trustee ____X____;
DATE OF SERVICE: __May 22, 2009__

---

| MOVING PARTY'S CONENTIONS: | DEBTOR'S CONTENTIONS: |
|---|---|
| The EXTENT and PRIORITY of LIENS: | The EXTENT and PRIORITY of LIENS: |
| 1st _$95,125.00_____ | 1st _____ |
| 2nd _$18,062.85_____ _____ | 2nd _____ |
| 3rd _____ | 3rd _____ |
| 4th _____ | 4th _____ |
| Other _____ | Other _____ |
| Total Encumbrances:_____ | Total Encumbrances:_____ |
| APPRAISAL of OPINION as to VALUE: | APPRAISAL of OPINION as to VALUE: |
| APPROXIMATELY: $425,000.00 | |

---

**TERMS of MOVANT'S CONTRACT**
**with the DEBTOR(S):**

Amount of Note:__$100,000.00__
Interest Rate: ___7.34%___
Duration: __36 months__
Payment per Month: __$__
Date of Default:_12/20/08-4/20/09_
Amount of Arrears: _$310.91_
Date of Notice of Default: n/a
SPECIAL CIRCUMSTANCES: Counsel attempted in good faith to communicate with the other parties regarding resolution of the Motion before filing its Motion for Relief from Stay.

SUBMITTED BY: JEFFREY G. SLOANE, ESQ.
Signature: /s/JEFFREY G. SLOANE, ESQ.
Kravitz, Schnitzer, Sloane, Johnson & Eberhardy, Chtd.
8985 S. Eastern Ave., Suite 200
Las Vegas, NV 89123

---

DEBTOR'S OFFER of "ADEQUATE
PROTECTION" for MOVANT:

· 
· 
· 
· 
· 
· 

SPECIAL CIRCUMSTANCES:

SUBMITTED BY: _____

SIGNATURE: _____

**"EXHIBIT A"**

# EXHIBIT 1

# Wells Fargo Bank, N.A.

**DATE OF AGREEMENT:** 05/09/2005
**ACCOUNT #:** ▬▬▬▬▬▬▬▬
**REFERENCE #:** 2005069740045 7

*30th*
*A*

## SmartFit Home Equity Account (SM) Agreement and Disclosure Statement (the "Agreement")

**Borrower Name:**
ROBERTA M BENTLEY
ELMO J BENTLEY

**Property Address:**
6970 S VALLEY VIEW BLVD   LAS VEGAS, NV   891185262

**Mailing Address for billing purposes (if different)**   **Credit Line Limit: $** 100,000.00
N/A

## SECTION 1: MY ACCOUNT AGREEMENT

In this Agreement, the words, "I", "me" and "my" (which also means "we", "us", and "our", if more than one customer signs below) refer to each person who signs this Agreement. The words "you," "your," "Lender", and "the Bank" refer to Wells Fargo Bank, N.A. Each person who signs this Agreement is jointly and individually (solidarily) bound by its terms and will be directly liable to the Bank for the entire amount owed on the Account, and each is liable as the principal and not merely as a guarantor, even if only one of us uses the Account.

## SECTION 2: SECURITY INTEREST

[x] I am giving the Bank a Deed of Trust, Mortgage or other Security Instrument (the "Security Instrument"), dated the same date as this Agreement on my property. The property is located at the address shown above (the "Property").

[✔] This Agreement is intended to evidence an "Extension of Credit" as that term is defined by Section 50(a)(6), Article XVI of the Texas Constitution secured by a Deed of Trust (the Security Instrument) dated the same date of this Agreement covering my homestead. The property is located at the address shown above (the "Property").

## SECTION 3: MY SMARTFIT HOME EQUITY ACCOUNT (the "Account")

My Account is a revolving account and will have both a Draw Period and Repayment Period (described below). My credit limit is shown above and will be displayed on each of my billing statements. During the Draw Period, as I use my account, my available credit will be my credit limit minus the sum of all unpaid Advances and other fees and charges posted to my Account. As I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an Advance that would cause my balance to exceed my credit limit. If at any time the balance of my Account exceeds my credit limit, I agree to be responsible for immediate repayment of the amount that exceeds my credit limit.

## SECTION 4: MY ACCOUNT DURING THE DRAW PERIOD

**DRAW PERIOD**
My Account has a Draw Period of 10 years from the date of this Agreement during which I may request advances. Bank may, at its option, extend the Draw Period of my Account for an additional 10 years. In the event I do not request a renewal, my ability to obtain advances will stop at the end of the draw period

: **8 MAY 19 2005 10 6**

EQ404A (08/2004)                    05/09/2005   09:12 AM

If my Account is closed during the Draw Period or the Draw Period ends, the unpaid balance on the Line of Credit will convert to a Fixed Rate Advance(s) as detailed in **MY ACCOUNT DURING THE REPAYMENT PERIOD.**

## ADVANCES DURING THE DRAW PERIOD
There are 3 types of advance methods on my Account:

- Fixed Rate Initial Advance
- Line of Credit Advances
- Fixed Rate Advance(s)

Advances requested by me, if my Account is not closed or suspended, shall be considered obligatory as long as I am in compliance with all terms of this Agreement. The Bank may, at its discretion, withhold a portion of the available credit on my Account up to the amount of any payment due in order to assure that my check or other payment instrument is honored.

### Fixed Rate Initial Advance
The Fixed Rate Initial Advance:

- must be requested within  5  days of Account opening
- will have a fixed interest rate
- will have a monthly payment for a  36      month term

The Minimum Monthly Payment will be:

☐ $25.00 plus the accrued FINANCE CHARGE
☒ Accrued FINANCE CHARGE

**Fixed Rate Initial Advance Finance Charge**
During the Fixed Rate Initial Advance term (disclosed above), FINANCE CHARGES begin to accrue on amounts advanced on the date the advance is made. I will be charged a FINANCE CHARGE on the unpaid balance of my Fixed Rate Initial Advance at the end of each day at a fixed daily periodic rate. The rate will be equal to 1/365 (1/366 during leap years) of an ANNUAL PERCENTAGE RATE of   7.340  %, resulting in a Daily Periodic FINANCE CHARGE of   .020110 %. The ANNUAL PERCENTAGE RATE does not include charges other than interest. After the Fixed Rate Initial Advance term, any such remaining balance will be subject to the FINANCE CHARGES as described in the **Line of Credit Advance(s) Finance Charge** section below.

### Line of Credit Advance(s)
As I use my Account, my available credit will be my credit limit minus the sum of all unpaid advances. As I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an advance that would cause my aggregate balance to exceed my credit limit. If I do exceed my credit limit, I agree to be responsible for immediate repayment of the amount that exceeds my credit limit.

I will not make an advance for which there is not sufficient available credit in my account, or which would violate any law. Each advance I request will be in the amount of:

☒ $300 or greater.

☐ $4,000 or greater (Texas homestead property only).

I understand that the Bank may refuse to pay any advance if the advance does not comply with every requirement of this Agreement. The Bank may choose at its sole discretion to make an advance that does not comply. The Bank may pay any advances in any sequence convenient to the Bank.

The Bank is authorized to make an advance from my Account when it receives a request given by any person who has signed this Agreement. If there are conflicting demands made by any of us who signed this Agreement, the Bank has the option to refuse to make any advance that has not been requested by all of us together. The Bank will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when the Bank acts upon such instructions believing them to be genuine.

### Line of Credit Advance Methods
While my Account is not in default, closed, or suspended, I may borrow money through my Account by:

☒ Requesting an advance in person at any Bank branch,
☒ Requesting an advance by phone,
☒ Writing a special check or draft which the Bank has provided to me,
☒ In other ways the Bank authorizes from time to time,

[X] Obtaining a cash withdrawal or transferring funds by using my Wells Fargo ATM Card or Wells Fargo
ATM & Check Card, if offered by the Bank and I select such service,

[X] EquityLine Platinum® Card  (Available only upon request).

**Line of Credit Advance(s) Finance Charge**
The Line of Credit interest rate is tied to an Index (to which a margin or spread as shown below is added) and may change for each monthly billing cycle.  During the Draw Period, **FINANCE CHARGES** begin to accrue on amounts advanced on the date each advance is made.   I will be charged a **FINANCE CHARGE** on the unpaid balance of my Line of Credit at the end of each day at a variable Daily Periodic Rate.

- The variable Daily Periodic **FINANCE CHARGE** Rate is equal to 1/365 (1/366, during leap years) of an annual rate of  . 000  % (the "margin" or "spread") plus the "Index Rate".

- The Index Rate is the Wall Street Journal Prime Rate (Western Edition) as published in the "Money Rates" section.  When a range of rates is published, the Index is the highest rate.

The variable Daily Periodic **FINANCE CHARGE** Rate may increase from billing cycle to billing cycle if the Index Rate increases. The initial variable Daily Periodic FINANCE CHARGE Rate is  . 016438 %.  This corresponds to an initial **ANNUAL PERCENTAGE RATE** of   6. 000  %.  This rate is subject to any minimum rate or maximum rate disclosed in this document.

[/] If this box is checked, the variable Daily Periodic **FINANCE CHARGE** Rate on my Line of Credit will be adjusted on the first day of every billing cycle, using the Index Rate published on the last business day of the prior month.  I understand that any increase may cause me to make larger monthly payments.

[/] If this box is checked, the variable Daily Periodic **FINANCE CHARGE** Rate on my Line of Credit will be adjusted on the first day of every billing cycle, using the Index Rate published on the last day of my prior cycle.  I understand that any increase may cause me to make larger monthly payments.

[X] If this box is checked, the variable Daily Periodic **FINANCE CHARGE** Rate on my Line of Credit
will be adjusted the day of an Index Rate change as published in the Wall Street Journal. I understand that any  increase may cause me to make larger monthly payments.

[/] If this box is checked, the variable Daily Periodic **FINANCE CHARGE** Rate on my Account will be adjusted on the first day of every month, using the Index Rate published on the last business day of the prior month. I understand that any increase may cause me to make larger monthly payments.

- The **ANNUAL PERCENTAGE RATE** on my Line of Credit will never be more than   18. 000 %.  The **ANNUAL PERCENTAGE RATE** does not include any charges other than interest.

[X] If this box is checked, the above referenced spread or margin, **ANNUAL PERCENTAGE RATE**, and daily periodic **FINANCE CHARGE** shall be changed daily in accordance with the table below, based on my unpaid balance on my Line of Credit, not including any Fixed Rate Initial Advance or Fixed Rate Advance balances, at the end of each day, subject to any minimum rate or maximum rate disclosed in this document.

| RANGE OF OUTSTANDING BALANCES | | MARGIN ADDED TO INDEX | ANNUAL PERCENTAGE RATE | DAILY PERIODIC RATE |
|---|---|---|---|---|
| Up to $ 19,999 | | . 000 % | 6. 000 % | . 016438 % |
| $ 20,000 | to $ 49,999 | −0. 250 % | 5. 750 % | . 015753 % |
| $ 50,000 | and above | −0. 350 % | 5. 650 % | . 015479 % |

[X] If this box is checked, there is a Minimum **ANNUAL PERCENTAGE RATE** on my Line of Credit.  The **ANNUAL PERCENTAGE RATE** on the Line of Credit will never be less than  4. 240 % (the "Floor Rate").  If the initial **ANNUAL PERCENTAGE RATE** set forth above is LESS than  4. 240 %, then the actual daily periodic rate in effect as of the date of this Agreement is  . 011616   % , which corresponds to an **ANNUAL PERCENTAGE RATE** of  4. 240 %.

**Line of Credit Advance(s) Payment**
During the Draw Period my Line of Credit Regular Minimum Monthly Payment shall be in accordance with the payment option checked below:

[/] A payment equal to the greater of $100.00 or 1.5% of my unpaid Line of Credit balance and credit insurance premiums, if any.   This amount will change in the Repayment Period.

[x]  A payment equal to the **FINANCE CHARGE** and credit insurance premiums, if any, owing. This amount will change in the Repayment Period.

**Fixed Rate Advance (s):**
An optional feature of this Account is that I may convert future advances to a Fixed Rate Advance (s) during the Draw Period based on credit limit availability.

**Fixed Rate Advance(s) Finance Charge**
The Fixed Rate Advance(s) interest rate is tied to an Index (to which a margin or spread within the maximum stated below is added) as of the date the Fixed Rate Advance(s) is requested.

During the Draw Period on my Account I may request up to 8 Fixed Rate Advance(s) with no more than 3 Fixed Rate Advance(s) existing at any one time in the amounts and terms within the ranges set forth below:

| Fixed Rate Advance Amount | Term Range |
|---|---|
| $10,000 -  19,999.99 | 5 to 15 years |
| $20,000 -  49,999.99 | 5 to 30 years |
| $50,000 - and above | 7 to 30 years |

During both the Draw and Repayment Period, you will charge me the **FINANCE CHARGE** on my unpaid Fixed Rate Advance(s) balance at the end of each day at a fixed daily periodic rate.  It is equal to 1/365 (366 during leap years) of an annual rate calculated by adding a variable margin of  0% to 8% (the margin or spread) plus the "Index Rate" in effect on the day I request the Fixed Rate Advance.  The Index Rate is the Wall Street Journal Prime (Western Edition) based on the Index published in the "Money Rates" section on the day I request the Fixed Rate Advance.  The margin shall be determined by the bank in its sole discretion based upon its then current interest rates for advances of similar amount and terms. The **ANNUAL PERCENTAGE RATE** on my Fixed Rate Advance(s) will never be more than18 . 000%.  The **ANNUAL PERCENTAGE RATE** does not include charges other than interest.

**Fixed Rate Advance(s) Conversion Fee**
[x]  I agree to pay you a $50.00 Conversion Fee each time I request and obtain a Fixed Rate Advance(s).

[/]  There is no Conversion Fee (Texas properties only).

**Fixed Rate Advance(s) Payment**
During the Draw and Repayment Period my Minimum Monthly Payment will be the equal to the amount of principal plus **FINANCE CHARGE** sufficient to repay each Fixed Rate Advance(s) within the chosen term in equal, fully amortizing monthly payments.   This assumes that all payments will be made on their due dates, which will be the same due date as the Line of Credit Minimum Payment Due Date.  If my payments are not consistently made when due, the final payment amount may be adjusted.

**Example of Finance Charge and Terms on Future Fixed Rate Advance**
For example, if I were to request a Fixed Rate Advance in the amount of $10,000 for a 5 year term, on a day when the Index is the same as it is today and the margin were 8%, my fixed Daily Periodic **FINANCE CHARGE** on my Fixed Rate Advance would be  . 038356 % with a corresponding **ANNUAL PERCENTAGE RATE** of   14 . 00%.   In connection with this Fixed Rate Advance, I would make 60 Minimum Monthly Payments consisting of both principal and interest.

**My Total Account Payment Due During the Draw Period.**
To make all required payments on my Account, I will receive monthly billing statements from the Bank. The Ending Balance shown on my billing statement is the total of all unpaid obligations which have been posted to my Account as of the date of the statement, including line of credit advances, overlimit amounts (to the extent allowed by law), Fixed Rate Initial Advance and Fixed Rate Advance(s), **FINANCE CHARGES**, Late Charges, insurance, other charges, and fees. I can pay either the Ending Balance in full or in monthly installments, but I must pay at least the amount of the Total Payment Due by the Date Due, as shown on the billing statement.

The "Total Payment Due" consists of my Fixed Rate Initial Advance, Fixed Rate Advance(s) and Line of Credit Regular Minimum Monthly Payment together with all past due amounts and overlimit amounts (to the extent allowed by law) and all other charges due.

**My Total Finance Charge on my Account During the Draw Period**
My **FINANCE CHARGE** for each monthly billing cycle is figured by separately multiplying the unpaid Line of Credit balance and Fixed Rate Initial Advance and Fixed Rate Advance(s) balances, if any, at the end of each day in the current billing cycle by the applicable Daily Periodic Rates and then adding the results together.  My unpaid balances at the end of each day will reflect all advances, balances, payments and credits made that day.

EQ404D  (08/2004)                                                  05/09/2005    09:12 AM

**Credit Limit Increases to my Account during the Draw Period**

**Customer Requested Credit Limit Increase**
I may apply for an increase in my credit limit, and if I do so I agree to pay any application, appraisal and other fees, including increased costs for title insurance, as the Bank may require. If the Bank approves my application and increases my credit limit, I will provide and maintain such additional hazard insurance (including flood insurance, if necessary) as the Bank may require.

**Bank Credit Limit Increases**
The Bank may from time to time in its sole discretion, approve additional credit for me under the terms of this Agreement. I will receive written notice from the Bank of such offer to increase my Credit Limit. I may accept such offer of increased credit by my use of those additional funds without signing any additional documents. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Mortgage or Deed of Trust, which secures this Agreement.

## SECTION 5: MY ACCOUNT DURING THE REPAYMENT PERIOD

**REPAYMENT PERIOD**
I understand that advances will no longer be allowed at the end of the Draw Period. At that time, I will begin the Repayment Period, which will continue until the Maturity Date.

**FIXED RATE ADVANCE(S)**
During the Repayment Period, I will continue to make my payments on my Fixed Rate Advance(s) in effect as of the end of the Draw Period. If my payments are not consistently made when due, the final payment amount will be adjusted. The Bank will notify me in advance of any changes to my Fixed Rate Advance Regular Minimum Monthly Payments.

**LINE OF CREDIT BALANCE DURING THE REPAYMENT PERIOD**
After the expiration of the Draw Period, unless I request a shorter term, the unpaid Line of Credit Balance will be converted into a new Fixed Rate Advance. The Fixed Rate Advance created as a result of the unpaid balance on my Line of Credit at the end of Draw Period:

- Will have a term of 15 years if the unpaid balance is less than $20,000 or 30 years if the unpaid balance is $20,000 or more.

- Will have equal, fully amortizing payments of principal and interest sufficient to repay the new Fixed Rate Advance by the end of its term.

- Will have a minimum principal and interest payment of $100, which may result in a term less than 15 years.


The Bank will notify me in advance of any changes to my payments due on this new Fixed Rate Advance. If my payments are not consistently made when due, the final payment amount will be adjusted.

**FINANCE CHARGE DURING THE REPAYMENT PERIOD**
At the end of the Draw Period, when my unpaid Line of Credit balance converts to a Fixed Rate Advance, the **FINANCE CHARGE** on my balance will begin to accrue on the first day of the Repayment Period. I will be charged a **FINANCE CHARGE** based on the unpaid Fixed Rate Advance balance at the end of each day at the fixed Daily Periodic Rate, equal to 1/365 (1/366 during leap years) of the Index Rate published on the first business day after the end of the Draw Period plus the spread or margin as described under the section entitled **MY ACCOUNT DURING THE DRAW PERIOD, Fixed Rate Advance(s).**

**MATURITY DATE**
The Maturity Date on my Account shall be the later of (a) the maturity date of any Fixed Rate Advances(s) in effect on the day after the end of the Draw Period, or (b) the maturity date of the conversion of my unpaid Line of Credit to a Fixed Rate Advance after the end of the Draw Period. At that time, any remaining balance must be paid in full.

## SECTION 6: AUTOMATIC PAYMENT DISCOUNT

[x] If this box is checked, I have chosen to make Automatic Payments from a qualified account, for all payment obligations under this Agreement as specified in the Authorization for Automatic Transfer and received a discount for making this choice.    I understand that the **ANNUAL PERCENTAGE RATE** on my Line of Credit described above was based on a discount you gave me for this authorization for automatic payments from a qualified account. If the automatic payments are terminated for any reason by anyone, the spread or margin set forth hereinabove used to calculate the rate of **FINANCE CHARGE** on my Account will increase by 0.25 % effective the next business day after the automatic payments are terminated. I will receive notice of this change in interest rate and payment as applicable.

[N/A] If this box is checked the Automatic Payment Discount is not available for this Account.

### AUTOMATIC PAYMENT DISCOUNT CANCELLATION – FIXED RATE ADVANCE (S)

If I have selected the automatic payment feature and either I or the Bank has canceled this feature for any reason, then the interest rate on each of my Fixed Rate Advances will be subject to a one time increase of one quarter of a percentage point. If this happens, my monthly payments will be increased by an amount sufficient to repay the advance(s) over its remaining term in substantially equal payments. I will be notified in writing at least 25 days before the first increased monthly payment is due. This notice will contain information about my interest rate, payment amount and balance.

## SECTION 7: OTHER FINANCE CHARGES

### ORIGINATION FEE (COLLECTION DEFERRED)

[x] If this box is checked I agree to pay a $500 Origination Fee. The Bank has agreed to defer the collection of this Fee. This fee will be due and payable in full at any time within the first 3 years of my Account opening, if I close my Account (for any reason other than default, casualty loss, refinance with you or your affiliate or termination by the Bank). After 3 years, the Bank will waive this amount without any further action required on my part

### ORIGINATION FEE (COLLECTED AT ACCOUNT OPENING)

[N/A] If this box is checked I agree to pay a $ N/A        Origination Fee collected at the opening of my Account.

### PROCESSING FEE (COLLECTED AT ACCOUNT OPENING)

[N/A] If this box is checked I agree to pay a $ N/A        Processing Fee collected at the opening of my Account.

### LINE OF CREDIT RATE CAP BUY-DOWN (OPTIONAL)

[N/A]   If this box is checked, I agree to pay $ N/A        to the Bank to receive a reduced maximum **ANNUAL PERCENTAGE RATE** on my Line of Credit ("Line of Credit Rate Cap") equal to no more than N/A % plus the initial **ANNUAL PERCENTAGE RATE**      N/A%, for a lower maximum **ANNUAL PERCENTAGE RATE** of     N/A% on my Line of Credit. This reduction has been reflected in the Line of Credit Rate Cap disclosed in the **Line of Credit Advance(s) Finance Charge** section above. I understand that this does not apply to my Fixed Rate Advance(s).

### FIXED RATE INITIAL ADVANCE RATE BUY-DOWN (OPTIONAL)

[N/A] If this box is checked, I agree to pay $ N/A        to the Bank to receive a   N/A    % reduction of the Periodic FINANCE CHARGE on my Fixed Rate Initial Advance.  This reduction has been reflected in the rate disclosed in the **Fixed Rate Initial Advance Finance Charge** section above.  I understand that this does not apply to my Line of Credit Advance and my Fixed Rate Advance balances.

### ADDITIONAL FEES (OTHER FINANCE CHARGES)

In addition to the **Other Finance Charges** provided above in this Section 7, the following charges described on the HUD Settlement Statement and to be paid by me at the opening of my Account (as applicable) are also **Other Finance Charges**: Application Fee, Accommodation Recording/Signing Fees, Administrative Fee, Attorney Fee, Express Mail – Overnight Delivery, Mortgage Broker Fees, Computerized Loan Origination Fee, Document Preparation Fee, Points, Prepaid Interest, Redraw Fee, Recording Service Fee, Settlement or Closing (Escrow) Fees, Servicing Fee, Subordination Fee, Tax Service Fee, Underwriting Fee, and Wire/Fax/Courier Fee.

## SECTION 8: OTHER CHARGES AND COSTS DUE

I agree to pay the Bank the charges and costs set forth herein and those described on the HUD Settlement Statement (if applicable) at the opening of my Account.

## SECTION 9: FEES, COSTS AND CHARGES

In addition to the **FINANCE CHARGE**, I agree to pay the following non-refundable Fees, Costs and Charges, which will be owed once charged to my Account.

EQ404F (08/2004)                                                05/09/2005    09:12 AM

**ANNUAL FEE**

[X] If this box is checked, beginning 3 year after the Date of this Agreement, each year my Account is open, whether or not I use it, a $ 75.00 non-refundable Annual Fee will be charged to my Account. This fee is billed on the monthly billing statement prepared in my Anniversary month. If my Account is open and my average daily balance is $20,000 or greater for the 12 months up to and including my Anniversary month, then the Bank will credit my Account $75.00 on the monthly billing statement prepared in my Anniversary month. For the purpose of making this determination, the Bank will add the average daily balance shown on the 12 monthly billing statements and divide the total by 12.

[/] If this box is checked, each year my Account is open, whether or not I use it, a $ N/A non-refundable Annual Fee will be charged to my Account. This fee is waived the first 3 years my line of credit account is opened, and is billed beginning in the second and each succeeding year, during the Draw Period, on the anniversary date of my line of credit.

[/] If this box is checked there is no annual fee on my Account

**LATE CHARGES**

If my scheduled payment is more than 10 days past due, I will pay a Late Charge equal to the greater of 5% of the scheduled payment or five ($5.00) dollars.

**PREPAYMENT FEE**

[X] If this box is checked I agree to pay a prepayment fee of $ 500.00 . This fee will be due and payable in full at any time within the first 3 years from the date of this Agreement if I close my Account (for any reason other than default due to non-payment, casualty loss, or refinance with you or your affiliate). If my account remains open over 3 years from the date of this Agreement, no prepayment fee will be assessed. No tender of a prepayment of this Agreement shall be effective unless and until such prepayment is accompanied by the applicable prepayment fee.

[/] If this box is checked, I have requested a waiver of the prepayment fee. I understand that the margin or spread disclosed in the **Line of Credit Advance(s) Finance Charge** section above has been increased by .25% for this waiver.

[/] If this box is checked there is no prepayment fee on my account.

**OTHER CHARGES**

To the extent allowed by law, I agree to pay the following fees if I request or authorize these additional services:
(a) **Fax Fee**: If I request or authorize others to request any document or letter to be transmitted by facsimile (fax) machine, the Bank will charge me a fee in the amount of $10.
(b) **Research Fee and Photocopy Fee**: If for any purpose other than a billing error inquiry, I request or authorize someone to request that the Bank research my Account or provide photocopies of Account documents, the Bank will charge me a fee in the amount of $5 per photocopy.
(c) **Reconveyance or Satisfaction Fee**: Reconveyance and satisfaction fees will be charged as allowed by the law of the state where the Property is located.
(d) **Stop Payment Fee**: If I request that the Bank stop payment on a draft I have used to advance on my Line of Credit, the Bank will charge me a fee of $25.
(e) **Return Check Fee**: If I make a payment with a check that is dishonored for any reason, the Bank will charge me a fee of $25.
(f) **Overlimit fee**: An overlimit fee will be charged in the amount of $25.
(g) **Return Advance Check Fee (insufficient funds)**: A Return Advance Check Fee will be charged in the amount of $25.

## SECTION 10:  COLLECTION COSTS AND ATTORNEY'S FEES

If I am in default, and to the extent not prohibited by applicable law, I will pay the Bank's collection costs, attorney's fees and other expenses of enforcing the Bank's rights under this Agreement and the Security Instrument on the Property.

## SECTION 11:  METHOD OF PAYMENT

Depending on my chosen method of payment, the Bank will do one of the following each month, during both the Draw and Repayment Periods:

[/] Provide me with a bill stating the Total Payment Due.

[x] Automatically charge my account (under the terms of a separate written (ACH) automatic transfer authorization) for Total Payment Due. Other charges due will be billed and must be paid separately. However, if I have past due amounts on my Account, you will bill me for all payment amounts due and not use an automatic payment to collect these amounts.

## SECTION 12:  SCHEDULED PAYMENT DUE DATE

My monthly due dates for my Total Payments Due is the       20 day of each and every month during both the Draw and Repayment Periods.

## SECTION 13:  MY PROMISE TO PAY

I promise to pay to the Bank the total of all advances which I make or which I authorize to be made from my Account. I promise to pay the total of any **FINANCE CHARGE**, plus all amounts past due, overlimit amounts, and any Late Charges, fees, other charges and other obligations charged to my Account under this Agreement or the Security Instrument.    All payments made under this Agreement will be made in U.S. dollars.

I will make payments at the Bank's address for receiving a payment, as indicated on my payment coupon and billing statement, unless another payment method is authorized by the Bank.  Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement.

I understand that payments I make by Automatic Payments or by mail to the remittance address indicated on my billing statement and received prior to a 5 p.m. cut-off time on any day, including Saturdays, Sundays and holidays, will be credited to my Account as of the date received. Payments received after the cut-off time will be credited as of the next day.

I understand that payments I make at a Bank branch, online, by ATM, by telephone, or by any other means the Bank may make available to me and received prior to established cut-off times will be credited as of the business day the payment is received by the Bank.  Saturdays, Sundays, and federal holidays are not considered business days; payments received on these days or after established cut-off times will be credited as of the next business day.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Account and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Agreement. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and satisfaction nor a waiver of any rights the Bank has to receive full payment.  If I intend to condition a payment, pay the Account in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

## SECTION 14:  TAX DEDUCTIBILITY

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Account.

## SECTION 15:  REEVALUATION OF CREDIT QUALIFICATIONS AND CREDIT REPORTS

My signature on this Agreement authorizes the Bank to obtain credit information about me, including credit bureau reports, at any time. Such credit bureau reports may be requested or used in connection with (a) renewal or extension of this Agreement, (b) review of my Account, (c) taking any collection action or (d) any other legitimate purposes associated with my Account. Upon my request, I will be informed whether the Bank obtained a credit bureau report and, if so, the name and address of the credit bureau that furnished the report. I agree to submit current financial information to the Bank upon the Bank's request. The Bank may reexamine and reevaluate my credit qualifications at any time. The Bank may report its experience with me and my Account to others, to the extent allowed by law.

## SECTION 16:  PAYOFF BALANCE INFORMATION

The Bank will tell me the balance required on any given day to pay off my Account in full, if I so request. If such request is made on my behalf by an escrow holder or settlement agent, the Bank may immediately freeze my Account. While my Account is frozen, I cannot receive new advances and the Bank will return unpaid any advance checks the Bank receives and refuses to honor any other advance request made on my Account. This payoff freeze will be lifted and my Account reopened if the request for payoff balance information is withdrawn and the Bank has received written confirmation from the escrow holder or other settlement agent that the escrow or other settlement has been cancelled.

## SECTION 17:  DEFAULT

I will be in default if (a) I fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is fraud or material misrepresentation by me in connection with this Agreement, or (c) any action or inaction by me adversely affects the Bank's security in the Property, including without limitation, transfer of the Property without the Bank's consent,

failure to maintain required insurance or pay required taxes, revocation or termination of any revocable trust that is an owner of the Property, or the death of any person who has signed this Agreement. If I am in default, the Bank, subject to applicable law, may do any or all of the following: (a) close my Account immediately, without notice; (b) return to the payee without paying any outstanding advance checks drawn on my Account and refuse to honor any other advance request made on my Account; and (c) require immediate payment of the entire balance of my Account, and, if I fail to pay, exercise the Bank's rights under the Mortgage/Deed of Trust covering the Property which may result in the loss of the Property. If I am in default, the method of determining the Daily Periodic FINANCE CHARGE Rate will remain as described in this Agreement. The Bank and I agree that notwithstanding any other provision of this Agreement or the Mortgage/Deed of Trust, the Bank will have the right to terminate or suspend my Account to the extent permitted by applicable law.

## SECTION 18: CLOSURE OR SUSPENSION OF ACCOUNT

Any one Borrower can close the Account by paying in full and sending a signed letter to the Bank requesting that the Account be closed. Any one Borrower may terminate the advance feature, at any time, by sending a signed letter to the Bank requesting the termination of the advance feature. To reactivate the advance feature on the Account, the Bank will require all Borrowers to sign such written request.

The Bank may suspend the use of my Account and temporarily close my Account to future advances for any reason permitted by applicable law, including without limitation, (a) if the annualized Daily Periodic FINANCE CHARGE Rate equals or exceeds the Maximum Annual Percentage Rate stated herein, (b) there is any material change in my financial circumstances that the Bank reasonably believes will make me unable to fulfill my repayment obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued advances would constitute an unsafe and unsound business practice, or (f) government action prevents the Bank from imposing the Annual Percentage Rate provided for in this Agreement or impairs the Bank's Security Interest, such that the value of the security interest is less than 120 percent of the Credit Limit. In the event of a suspension of my Account, the Bank is authorized to obtain such information as may be required by the Bank, including without limitation, credit reports and appraisals of the Property, to evaluate any request by me to reinstate the Account. I authorize the Bank to bill the cost of obtaining such additional information to my Account. If my Account is closed or suspended for any reason, the Bank may return to the payee without paying any outstanding advance checks drawn on my Account and refuse to honor any other advance request made on my Account. I will continue to be responsible for full payment of the balance of my Account as well as all other account obligations, according to the terms of this Agreement.

## SECTION 19: REINSTATEMENT OF CREDIT

I will receive a written notice if the Bank suspends or freezes my Account or reduces my Credit Limit. The notice will include the reason(s) for such action(s). Thereafter, if I wish to reinstate my Account or increase my Credit Limit, I agree to send a written request to the Bank at the address specified on my monthly billing statement, signed by all of the Borrowers, along with satisfactory evidence to the Bank that the reason(s) for suspension or reduction of my Account no longer exist(s). I also agree to provide the Bank promptly with any additional information necessary to support my request.

## SECTION 20: FURTHER ASSURANCES

I agree that I will take any steps, including but not limited to, signing, filing or recording any documents, which are necessary or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Agreement become and continue to be secured by the Security Instrument.

## SECTION 21: CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately (a) if the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) if there is any change in the ownership of the Property. I agree that my Account shall be closed and that the entire outstanding balance of my Account shall be due and payable immediately on any sale or other transfer of the Property. In this regard, I understand that if my Account is secured by a Deed of Trust or Mortgage containing the following or substantially similar provision: Upon sale, transfer, hypothecation, assignment or encumbrance, whether voluntary, involuntary or by operation of law, of all or any part of the Property or any interest therein, then at its sole option, the Bank may, by written notice to Trustor (or Grantor or Mortgagor), declare all obligations secured hereby immediately due and payable, except to the extent that such acceleration and in such particular circumstances where exercise of such a right by the Bank is prohibited by law.

## SECTION 22: CHANGE IN TERMS

To the extent allowed by law, I agree that the Bank may make certain changes to the terms of this Agreement at specified times or upon the occurrence of specified events. The Bank may make insignificant changes, such as changes in the address for payments, billing cycle dates, payment due dates, day of the month on which index values are determined, index or interest rate rounding rules, and balance computation method (if the change produces an insignificant difference in the

05/09/2005    09:12 AM

interest I pay). The Bank may also make changes that will benefit me, such as additional options or a temporary reduction in rates or fees. In accordance with federal law, the Bank may also change the index and margin used to determine the Annual Percentage Rate if the index is no longer available. The Bank may make any of the changes discussed above without my consent, unless state law provides otherwise. The Bank will give me any notice of change that is required by law. I may also agree to changes in writing.

## SECTION 23: WAIVERS

### BORROWER'S WAIVER
I waive my rights to require the Bank to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest"). Anyone else who agrees to keep the promises made in this Agreement, or who agrees to make payments to the Bank if I fail to keep my promises under this Agreement, or who signs this Agreement to transfer it to someone else, waives these rights. These persons are known as "guarantors, sureties and endorsers."

### BANK'S NON-WAIVER
The Bank may fail to make use of any of its rights under this Agreement or the Security Instrument on the Property on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations. The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving of its rights against any other party to this Agreement.

## SECTION 24: GOVERNING LAW

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under South Dakota law. In all other respects, this Agreement and all related documents, as well as the rights, remedies, and duties of the Bank and the borrower(s), shall be governed and interpreted by federal law with respect to national banks and, to the extent not preempted by federal law, the consumer protection laws of the state in which the real estate is located, except that Texas Finance Code Chapter 346 (which regulates certain revolving credit accounts) does not apply to this Agreement

## SECTION 25: ARBITRATION

### RESOLVING DISPUTES –ARBITRATION
I agree to contact the Bank immediately if I have a problem with one of my accounts or loans with the Bank or a service the Bank provides to me. Often a telephone call will resolve the matter quickly and amicably. However, if the Bank and I are not able to resolve our differences informally, I agree that any dispute between me and the Bank, regardless of when it arises or arose, will be settled using the following procedures.

I UNDERSTAND AND AGREE THAT THE BANK AND I ARE WAIVING THE RIGHT TO JURY TRIAL BEFORE A JUDGE IN A PUBLIC COURT.   FURTHER, I WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY DISPUTE SUBJECT TO ARBITRATION.

### DISPUTES
A dispute is any unresolved disagreement between the Bank and me that relates in any way to accounts, loans, services or agreements subject to this Arbitration provision. It includes any claims or controversy of any kind, which arise out of or are in any way related to these accounts, loans, services or agreements. It includes claims based on broken promises or contracts, tort (injury caused by negligent or intentional conduct), breach of fiduciary duty or other wrongful actions. It also includes statutory, common law and equitable claim. A dispute also includes any disagreement about the meaning of this Arbitration Section and whether a disagreement is a "dispute" subject to binding arbitration as provided for in this Arbitration Section. No dispute may be joined in an arbitration with a dispute of any other person or arbitrated on a class action basis. Furthermore, I agree that any arbitration I have with the Bank shall not be considered with any other arbitration and shall not be arbitrated on behalf of others without the consent of both me and the Bank.

### FEES AND EXPENSES OF ARBITRATION
Arbitration fees shall be determined by the rules or procedures of AAA, unless limited by applicable law.  I understand that the AAA will determine the fees applicable to any arbitration that may be filed. If the applicable law of the state in which I opened my account limits the amount of fees and expenses to be paid by me, then no allocation of fees and expenses to me shall exceed this limitation.  Unless inconsistent with applicable law, me and the Bank shall each bear the expense of our own attorney, expert and witness fees, regardless of whether me or the Bank prevails in the arbitration.  If either the Bank or I fail to submit to binding arbitration following a lawful demand, the party who fails to submit shall bear the costs and expenses incurred by the party compelling arbitration.

## BINDING ARBITRATION

Binding arbitration is a means of having one or more independent third parties resolve disputes without using the court system, judges or juries. Either me or the Bank may submit a dispute to binding arbitration at any reasonable time notwithstanding that a lawsuit or other proceeding has been commenced. The American Arbitration Association (the AAA) will administer each arbitration, including the selection of arbitrators, pursuant to the commercial arbitration rules of the AAA. Each arbitration will be governed by the provisions of the Federal Arbitration Act (Title 9 of the United States Code) and, to the extent any provision of that Act is inapplicable, unenforceable or invalid, the laws of the state governing the relationship between me and the Bank about which the dispute arose. To find out how to initiate arbitration, I can simply call any office of the AAA.

## EXCEPTION – CERTAIN REAL PROPERTY COLLATERAL

Notwithstanding contrary provisions herein, no dispute shall be submitted to arbitration if the dispute concerns indebtedness secured by real property and if arbitration of the dispute would preclude enforcement of a mortgage, lien or security interest securing such indebtedness unless the holder of such mortgage, lien or security interest specifically elects in writing to proceed with the arbitration.

## RIGHT TO OTHER REMEDIES PRESERVED

Neither this Arbitration Section, nor the exercise of any of the rights the Bank and I have under this Agreement, shall stop me or the Bank from exercising any lawful rights either me or the Bank has to use other remedies available for the purpose of (1) preserving, foreclosing, or obtaining possession of real or personal property; (2) exercising self-help remedies including setoff and repossession rights; or (3) obtaining provisional or ancillary remedies such as injunctive relief, sequestration, attachment, garnishment, or the appointment of a receiver from a court having jurisdiction.

## MISCELLANEOUS

The AAA – the arbitrator – and the parties – the Bank and I – shall, to the extent feasible, take any action necessary to assure that an arbitration proceeding hereunder is finished within one hundred eighty (180) days of the filing of the dispute with the AAA. Arbitration proceedings shall be conducted in the state in which I reside, at a location determined by the AAA. All statutes of limitations applicable to any dispute shall apply to any arbitration between the Bank and me. If a claim is properly filed in a small claims or justice court and if the small claims or justice court has jurisdiction to resolve the claim, including all cross-claims and counterclaims, then the party that demands arbitration and removes the claim from the small claims or justice court shall pay the administrative fee of the AAA and the fees, costs and expenses of the arbitrator

## SECTION 26: LOST OR STOLEN ADVANCE CHECKS, BILLING ERRORS

### LOST OR STOLEN ADVANCE CHECKS (WHERE AVAILABLE), BILLING ERRORS

I will immediately contact the Bank at the phone number on my statement and confirm by letter if any of my advance checks are ever lost or stolen, if there are any errors in my monthly statement, or if I suspect any unauthorized use of my Account.

The Bank will not return to me my cancelled advance checks or other advance instruments after paying them. The Bank will make available photocopies of my advance checks and other instruments upon request. I will examine my Account statement promptly in order to identify any improper or unauthorized entries. In consideration for the Bank's payment of each advance check, I agree that even though I will not receive the original checks, all time periods under the Uniform Commercial Code (UCC) for examining my statement and reporting improper entries, including that UCC's statutes of limitation with respect to forged, unauthorized, or missing signatures or endorsements, will begin from the time my Account statement is sent or made available to me.

### UNAUTHORIZED TRANSACTIONS

I will notify the Bank if someone has transferred, or may transfer money from my Account without my permission, or if I suspect any fraudulent activity on my Account. I can call the Wells Fargo Phone Bank at the telephone number on my statement, anytime, 24 hours a day, 7 days a week, or advise my local Bank office, followed by a written notice, or write to:

**P.O. Box 4233**
**Portland, OR 97208-4233**

### NOTIFY THE BANK IN CASE OF ERRORS OR QUESTIONS ABOUT MY BILL

If I think my bill is wrong or if I need more information about a transaction on my bill, I will send a letter on a separate page to the Bank, as soon as possible, at the address listed on my bill. The Bank must hear from me no later than 60 days after the Bank sent me the first bill on which the suspected error or problem appears. I can telephone the Bank, but doing so will not preserve my rights. In my letter, I will provide the Bank with the following information:

- My name, account number and daytime phone number, and
- The dollar amount of the suspected error, and
- A description of the error and explanation, if possible, as to why I believe there is an error. If I need more information, I will describe the item I am not sure about.

EQ404K (08/2004)

05/09/2005    09:12 AM

If I have authorized the Bank to pay my bill automatically from my checking account, I can stop the payment on any amount I think is wrong. To stop the payment, my letter must reach the Bank three business days before the automatic payment is scheduled to occur.

**MY RIGHTS AND THE BANK'S RESPONSIBILITIS AFTER RECEIPT OF MY WRITTEN NOTICE**
The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why the Bank believes the bill was correct. After the Bank receives my letter, the Bank cannot try to collect any amount I question or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my Credit Limit. I do not have to pay any questioned amount while the Bank is researching my account, but I am still obligated to pay the parts of my bill that are not in question. If the Bank finds that a mistake was made on my bill, I will not have to pay any finance charges related to the questioned amount. If the Bank didn't make a mistake, I will have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that payment is due.

If I fail to pay the amount that the Bank determines I owe, the Bank may report me as delinquent. However, if the Bank's explanation does not satisfy me and I write to the Bank within ten days telling the Bank that I still refuse to pay, the Bank must tell anyone the Bank reports to that I have a question about my bill. When the matter has been settled between the Bank and me, the Bank must tell anyone the Bank reports to that the matter has been settled. If the Bank does not follow the above rules, the Bank cannot collect the first $50 of the questioned amount, even if my bill was correct.

## SECTION 27:  NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Agreement may be given by mailing it to my address as it appears in the Security Instrument, or to a different address if I have properly notified the Bank of that different address. Any notice that I may send to the Bank must be given by mailing it to the Bank at the address provided on my billing statement, unless the type of notice is more specifically addressed in this Agreement and a different address is provided herein.

## SECTION 28:  PERSONAL LIABILITY (TEXAS HOMESTEAD PROPERTY ONLY)

Subject to the provisions of this Section, the Bank and I intend that this Agreement evidence a home equity line of credit made under the authority of Section 50(a)(6) and Section 50(t), Article XVI of the Texas Constitution (the "Equity Law"), and that this Agreement be secured by a lien on my homestead property which is the same as the Property.  As a home equity line of credit made pursuant to the Equity Law, the line of credit is without recourse for personal liability against the owner and the spouse of each owner of the homestead property, unless the owner or spouse obtained the line of credit by actual fraud. Subject to the following paragraphs of this Section, the provisions of this Agreement providing for payment of the indebtedness of this Agreement, attorney's fees and other expenses are limited by the Equity Law, and if not paid voluntarily, such amounts may be collected only from any persons or parties personally liable for payment pursuant to the Equity Law, or from proceeds of the sale of the Property, or otherwise in accordance with the Equity Law.

I intend to comply with all provisions and conditions of the Equity Law in order to secure this Agreement with a valid lien upon the Property.  If, however, for any reason the lien of the Deed of Trust on the Property (the "Deed of Trust") is invalid due to a mistake, error or misrepresentation by me or anyone else signing this Agreement (other than actual fraud or any owner or spouse in obtaining the line of credit), then the parties intend and agree that this line of credit is not an equity line of credit made under the Equity Law and the non-recourse provisions of the Equity Law are not applicable. If, for any reason the Property described in the Deed of Trust is not homestead property, due to mistake, error or misrepresentation by me or anyone else signing this Agreement, then the parties intend and agree that this line of credit is not an equity line of credit made under the Equity Law, the non-recourse provisions of the Equity Law are not applicable, and the Deed of Trust remains a valid lien on the Property.

Acknowledging the complex and uncertain nature of the Equity Law, I release any claim or damages I may have now or in the future against the Bank relating to invalidity of the Lien or the Equity Law.

Provided, however, the provisions of this Section are not intended to act as waiver of any cure, penalty or other provisions of the Equity Law, if applicable. To the extent the terms of this Section conflict with any other provisions of this Agreement, the terms of this Section shall control.

## SECTION 29:  ADDENDUM

☑ If this box is checked, I agree to the attached addendum, modifications or amendments
   N / A

05 / 09 / 2005     09 : 12  AM

## SECTION 30: STATE DISCLOSURES

THIS AGREEMENT, THE DEED OF TRUST AND THE CLOSING DOCUMENTS EXECUTED HEREWITH
CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT OF THE
PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR
SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS
BETWEEN THE PARTIES RELATING TO THIS AGREEMENT.

N / A

05/09/2005    09:12 AM

## NOTICE TO THE BORROWER

**DO NOT SIGN THIS AGREEMENT IF IT CONTAINS BLANK SPACES. ALL SPACES SHOULD BE COMPLETED BEFORE THIS AGREEMENT IS SIGNED. READ THIS AGREEMENT BEFORE SIGNING IT.**

**ACKNOWLEDGMENT**

I have received, read and retained a copy of the EquityLine with FlexAbility (SM) Agreement and Disclosure Statement, Agreement to Provide Insurance, the Mortgage/Deed of Trust on the Property securing this Account, and the HUD Settlement Statement provided to me at the closing, all of which I agree to by signing this Agreement. In addition, I hereby agree that the terms of this Agreement replaces the terms of any prior oral or written agreements, including for example, any and all commitment letters and pre-approval letters between the Bank and me.

BORROWER ROBERTA M BENTLEY                          5/10/05
                                                    DATE SIGNED

BORROWER ELMO J BENTLEY                             5/10/05
                                                    DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

BORROWER                                            DATE SIGNED

EQ404N (08/2004)

EXHIBIT 2

**20050603-0001525**

Fee: $22.00
N/C Fee: $0.00

06/03/2005          10:03:45
T20050101991

**Requestor:**
WELLS FARGO BANK NA

**Frances Deane**                    GWC
**Clark County Recorder**      Pgs: 9

Recording requested by:
Wells Fargo Bank, N.A.

When recorded return to:
Wells Fargo Bank, N.A.
P. O. BOX.31557
BILLINGS, MT 59107
DOCUMENT MANAGEMENT

Assessors Parcel Number:
177-05-301-010

—————State of Nevada————          Space Above This Line For Recording Date—————
REFERENCE #: 20050697400457          ACCOUNT #:

# DEED OF TRUST

1. **DATE AND PARTIES.** The date of this Deed of Trust ("Security Instrument") is 05/09/2005
   and the parties are as follows:
   TRUSTOR ("Grantor"):
   ELMO J. BENTLEY AND ROBERTA M. BENTLEY, HUSBAND AND WIFE AS
   JOINT TENANTS

   whose address is:
   6970 S VALLEY VIEW BLVD LAS VEGAS, NV,  89118
   TRUSTEE:   **AMERICAN SECURITIES COMPANY OF NEVADA**
              P. O. BOX 31557
              BILLINGS, MT 59107
   BENEFICIARY ("Lender"): Wells Fargo Bank, N.A.
              P. O. BOX 31557
              BILLINGS, MT 59107

2. **CONVEYANCE.**   For good and valuable consideration, the receipt and sufficiency of which is
   acknowledged, and to secure the Secured Debt (defined below) and Grantor's performance under this
   Security Instrument, Grantor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of
   Lender, with power of sale, all of that certain real property located in the County of
                    CLARK, State of Nevada, described as follows:
   THAT PORTION OF THE NORTHWEST QUARTER (NW 1/4) OF THE NORTHWEST QUARTER (NW
   1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 5, TOWNSHIP 22 SOUTH,
   RANGE 61 EAST, M.D.M. LOT TWO (2) AS SHOWN BY MAP THEREOF IN FILE 2 OF
   PARCEL MAPS, PAGE 13, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY,
   NEVADA. PURSUANT TO NRS SECTION 111.312, THE ABOVE LEGAL DESCRIPTION IS THE
   SAME PROPERTY CONVEYED IN DEED RECORDED 1/15/1999 AS INSTRUMENT NO.
   990115001921.

EQ128 A (10/2003)

with the address of
6970 S VALLEY VIEW BLVD  LAS VEGAS, NV  891185262
and parcel number of 177-05-301-010                , together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

**3.  MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ 100,000.00          . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**4.  SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
  A.  Debt incurred under the terms of the promissory note, revolving line of credit agreement, contract, guaranty or other evidence of debt dated 05/09/2005 together with all amendments, extensions, modifications or renewals. The maturity date of the Secured Debt is 05/09/2045          .

  B.  All future advances from Lender to Grantor under such evidence of debt. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances which exceed the amount shown in Section 3. Any such commitment must be agreed to in a separate writing.

  C.  All sums advanced and expenses incurred by Lender for insuring, preserving, or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**5.  PAYMENTS.** Grantor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

**6.  WARRANTY OF TITLE.** Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

**7.  PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Grantor agrees:
  A.  To make all payments when due and to perform or comply with all covenants.
  B.  To promptly deliver to Lender any notices that Grantor receives from the holder.
  C.  Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**8.  CLAIMS AGAINST TITLE.** Grantor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property, or any part thereof or interest therein, whether senior or subordinate hereto, when due. Lender may require Grantor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Grantor's payment. Grantor will defend title to the Property against any claims that would impair the lien of the Security Instrument. Grantor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Grantor may have against parties who supply labor or materials to maintain or improve the Property.

**9.  DUE ON SALE OR ENCUMBRANCE.** Upon sale, transfer, hypothecation, assignment or encumbrance, whether voluntary, involuntary, or by operation of law, of all or any part of the Property or any interest therein, then at its sole option Lender may, by written notice to Grantor, declare all obligations secured hereby immediately due and payable, except to the extent that such acceleration and in such particular circumstances where exercise of such a right by Lender is prohibited by law.

**10. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Grantor will keep the Property in good condition and make all repairs that are reasonably necessary. Grantor shall not commit or allow any waste, impairment, or deterioration of the Property. Grantor will not remove or demolish the Property, or any part thereof. Grantor will keep the Property free of noxious weeds, grasses and public nuisances.

EQ128 B  (10/2003)

Grantor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Grantor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Grantor will notify Lender of all demands, proceedings, claims, and actions against Grantor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Grantor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Grantor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Grantor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Grantor appoints Lender as attorney in fact to sign Grantor's name or pay any amount necessary for performance. Lender's right to perform for Grantor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Grantor irrevocably grants, sells and conveys to Trustee, in trust for the benefit of Lender, as additional security all the right, title and interest in and to any and all existing or future leases, subleases, and any other written or verbal agreements for the use and occupancy of any portion of the Property, including any extensions, renewals, modifications or substitutions of such agreements (all referred to as "Leases") and rents, issues and profits (all referred to as "Rents"). Grantor will promptly provide Lender with true and correct copies of all existing and future Leases. Grantor may collect, receive, enjoy and use the Rents so long as Grantor is not in default under the terms of this Security Instrument.

Grantor agrees that this assignment is immediately effective between the parties to this Security Instrument and effective as to third parties on the recording of this Security Instrument. This assignment will remain effective during any period of redemption by the Grantor until the Secured Debt is satisfied. Grantor agrees that Lender is entitled to notify Grantor or Grantor's tenants to make payments of Rents due or to become due directly to Lender after such recording.

However, Lender agrees not to notify Grantor's tenants until Grantor defaults and Lender notifies Grantor of the default and demands that Grantor and Grantor's tenants pay all Rents due or to become due directly to Lender.

On receiving notice of default, Grantor will endorse and deliver to Lender any payment of Rents in Grantor's possession and will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Any amounts collected will be applied as provided in this Security Instrument. Grantor warrants that no default exists under the Leases or any applicable landlord/tenant law. Grantor also agrees to maintain and require any tenant to comply with the terms of the Leases and applicable law.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Grantor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the property is a unit in a Condominium Project or is part of a Planned Unit Development ("PUD"), Grantor agrees to the following:

    A. **Obligations.** Grantor shall perform all of Grantor's obligations under the Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Projects or PUD and any homeowners association or equivalent entity ("Owners Association"); (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Grantor shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

    B. **Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project or PUD which is

EQ128 C (10/2003)

satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then Grantor's obligation under Section 19 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owner's Association policy. Grantor shall give Lender prompt notice of any lapse in required hazard insurance coverage. In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to Property, whether to the unit or to common elements, any proceeds payable to Grantor are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, with any excess paid to Grantor.

**C. Flood Insurance.** Grantor agrees to maintain flood insurance for the life of the Secured Debt which is acceptable, as to form, amount and extent of coverage to Lender.

**D. Public Liability Insurance.** Grantor shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**E. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Grantor in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 18.

**F. Lender's Prior Consent.** Grantor shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project or PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management by the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**G. Remedies.** If Grantor does not pay condominium or PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this section shall become additional debt of Grantor secured by this Security Instrument. Unless Grantor and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Secured Debt rate and shall be payable, with interest, upon notice from Lender to Grantor requesting payment.

**14. DEFAULT.** Grantor will be in default if any party obligated on the Secured Debt fails to make payment when due. Grantor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

**15. REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Grantor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Grantor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents, including without limitation, the power to sell the Property.

EQ128 D (10/2003)

If there is a default, Trustee shall, in addition to any other permitted remedy, at the request of the Lender, advertise and sell the Property as a whole or in separate parcels at public auction to the highest bidder for cash and convey absolute title free and clear of all right, title and interest of Grantor at such time and place as Trustee designates.

Trustee shall give notice of sale including the time, terms and place of sale and a description of the Property to be sold as required by the applicable law in effect at the time of the proposed sale.

Upon sale of the Property and to the extent not prohibited by law, Trustee shall make and deliver a deed to the Property sold which conveys absolute title to the purchaser, and after first paying all fees, charges and costs, shall pay to Lender all moneys advanced for repairs, taxes, insurance, liens, assessments and prior encumbrances and interest thereon, and the principal and interest on the Secured Debt, paying the surplus, if any, to Grantor. Lender may purchase the Property. The recitals in any deed of conveyance shall be prima facie evidence of the facts set forth therein.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Grantor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Grantor agrees to pay all of Lender's expenses if Grantor breaches any covenant in this Security Instrument. Grantor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Grantor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lenders' rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Grantor represents, warrants and agrees that:

    A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

    B. Except as previously disclosed and acknowledged in writing to Lender, Grantor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

    C. Grantor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Grantor shall take all necessary remedial action in accordance with any Environmental Law.

    D. Grantor shall immediately notify Lender in writing as soon as Grantor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

EQ128 E (10/2003)

18. **CONDEMNATION.** Grantor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Grantor authorizes Lender to intervene in Grantor' name in any of the above described actions or claims. Grantor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be paid to Lender and applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Grantor. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Grantor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires or is required by applicable law. The insurance carrier providing the insurance shall be chosen by Grantor subject to Lender's approval, which shall not be unreasonably withheld. If Grantor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

If Lender determines at any time during the term of the Secured Debt that the Property securing the Secured Debt is not covered by flood insurance or is covered by flood insurance in an amount less than the amount required by law, Lender will notify Grantor that Grantor should obtain flood insurance at Grantor's expense. If Grantor fails to obtain adequate flood insurance which is acceptable to Lender, Lender shall purchase flood insurance on Grantor's behalf.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Grantor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Grantor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Grantor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Grantor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to Grantor. If the Property is acquired by Lender, Grantor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Grantor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Grantor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Grantor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Grantor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Grantor signs this Security Instrument but does not sign an evidence of debt, Grantor does so only to transfer, mortgage and convey Grantor's interest in the Property to secure payment of the Secured Debt and Grantor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Grantor, Grantor agrees to waive any rights that may prevent Lender from bringing any action or claim against Grantor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Grantor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Grantor's consent. Such a change will not release Grantor from the terms of this Security Instrument. The

EQ128 F (10/2003)

duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Grantor and Lender.

**23. APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended of modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

**24. SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

**25. NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or as shown in Lender's records, or to any other address designated in writing. Notice to one Grantor will be deemed to be notice to all Grantors.

**26. WAIVERS.** In the event Grantor is not also the borrower, customer or obligor (all referred to as "Borrower") under the Secured Debt:

    A.  Grantor waives all rights of homestead exemption in the Property.

    B.  Grantor represents and warrants to Lender that this Security Instrument is executed at the request of the Borrower; Grantor will not, without prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or substantially all of the Property; and Grantor has established adequate means of obtaining from Borrower, on a continuing basis, financial and other information pertaining to the financial condition of Borrower. Grantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect the risks of Grantor, and Grantor further agrees that Lender has no obligation to disclose to Grantor information or material acquired in the course of Lender's relationship with Borrower.

    C.  Grantor hereby waives any right to require Lender to proceed against any person, including Borrower; proceed against or exhaust any collateral held from Borrower or any other person; pursue any other remedy in Lender's power; or make any presentments, demands for performance or give any notices of nonperformance, protests, notices of protest of dishonor in connections with the Secured Debt and this Security Instrument.

    D.  Grantor also waives any defense arising by reason of any disability or other defense of Borrower or any other defense of Borrower or any other person; the cessation from any cause whatsoever, other than payment in full of the obligations of

Borrower under this Security Instrument and Secured Debt; the application by Borrower of the proceeds of the Secured Debt; for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender to Grantor; any act or omission by Lender which directly or indirectly results in or aids the discharge of Borrower by operation of law or otherwise, including any impairment or loss of any security resulting from the exercise or election of any remedies by Lender, including, without limitation, election by Lender to exercise any of Lender's rights, now or hereafter obtained, under any power of sale set forth in any security instrument securing repayment of the indebtedness of Borrower and the consequent loss, limitation or impairment of the right to recover any deficiency from Borrower in connection therewith or due to any fair value limitations or determinations in connection with a judicial foreclosure; or any modification of the Secured Debt in any form whatsoever, including, without limitation, the renewal,

EQ128 G (10/2003)

extension, acceleration or other change in time for payment or any increase in the rate of interest. Until all amounts secured shall have been paid in full, Grantor further waives any right to enforce any remedy which Lender now has or may hereafter have against Borrower or any other person and waives any benefit of, or any right to participate in, any security whatsoever now or hereafter held by Lender.

E. Grantor acknowledges, warrants and agrees that each of the waivers set forth in this section are made with the full knowledge of their significance and consequence and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of said waivers are determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

27. **STATEMENT OF CONDITION.** From time to time, as required by law, Lender shall furnish to Grantor or its agent such statements as may be required concerning the condition of the Secured Debt. Lender will charge a fee for such statements as may be permitted by law.

28. **RECONVEYANCE.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and any note or instrument evidencing the Secured Debt to the Trustee. Trustee shall reconvey, without warranty, the Property or that portion secured by this Security Instrument. To the extent permitted by law, the reconveyance may describe the grantee as "the person or persons legally entitled thereto." Neither Lender nor Trustee shall have any duty to determine the rights of persons claiming to nbe rightful grantees of any reconveyance. Lender will charge a fee for such reconveyance as may be permitted by law.

29. **RIDERS.** If checked, the following are applicable to this Security Instrument. The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.

[N/A] Third Party Rider
[N/A] Leasehold Rider
[N/A] Other N / A _____

| Grantor advises to mail Tax Statements to: |
|---|
| Name:      ROBERTA M BENTLEY |
| Address:   6970 S VALLEY VIEW BLVD |
| LAS VEGAS, NV                    89118 |

EQ128 H (10/2003)

**SIGNATURES:** By signing below, Grantor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Grantor also acknowledges receipt of a copy of this Security Instrument.

| | | |
|---|---|---|
| *Roberta M Bentley* | | *5/10/05* |
| ROBERTA M BENTLEY | Grantor | Date |
| *Elmo J Bentley* | | *5/10/05* |
| ELMO J BENTLEY | Grantor | Date |
| | Grantor | Date |
| | Grantor | Date |
| | Grantor | Date |
| | Grantor | Date |

**ACKNOWLEDGMENT:**
(Individual)
STATE OF _Nevada_ , COUNTY OF _Clark_ } ss.

This instrument was acknowledged before me on _5/10/05_ by _Roberta M Bentley & Elmo J Bentley_

_N S. Gol_
Signature of notarial officer

_Notary Public_
Title and Rank (Optional)

My commission expires: _11/18/07_

```
         NOTARY PUBLIC
       STATE OF NEVADA
         County of Clark
04-89693-1  DOUGLAS S. GOLD
   My Appointment Expires Nov. 18, 2007
```

(Seal)

When recorded return to:
Wells Fargo Consumer Loan Servicing Center
Wells Fargo Bank, N.A.
P. O. BOX 31557
BILLINGS, MT 59107
DOCUMENT MANAGEMENT

EQ128 I (10/2003)